1

```
 1              TRANSCRIPTION OF TAPE RECORDED
                314 MEETING WITH CREDITORS
 2               IN RE:  SALLY K. CARTER

 3                 CASE No. 23-90157

 4
                      JIM INGHRAM
 5              BANKRUPTCY TRUSTEE INGHRAM
                      PRESIDING
 6

 7

 8

 9

10                  June 1st, 2023

11              Transcribed from a tape by:

12
              Deann K. Parkinson:  CSR 84-002089
13          Area Wide Reporting & Video Conferencing
                    301 West White
14            Champaign, Illinois  61820
                   (800)747-6789
15

16

17
            THOSE PRESENT AND IDENTIFIED ON THE CALL:
18

19
            Jim Inghram
20          Roger Prillaman
            Sally Carter
21          Bridget Kao
            Shannon DeLaMar
22          Sabrina Petesch

23

24
```

2

```
 1              (Tape transcription of the June 1st,
 2       2023, telephone hearing.)
 3              TRUSTEE INGHRAM:  All right.  The next
 4       case is Sally K. Carter.  Miss Carter, are you on
 5       the line?
 6              SALLY CARTER:  Yes, sir.
 7              TRUSTEE INGHRAM:  All right.  Mr.
 8       Prillaman, are you on the line as well?
 9              MR. PRILLAMAN:  Yes, Roger Prillaman
10       with the debtor today.
11              TRUSTEE INGHRAM:  Miss Carter, raise
12       your right hand and tell me when you've done that.
13              SALLY CARTER: Yes, I have.
14              (Witness Sally Carter sworn.)
15              TRUSTEE INGHRAM:  State your name for
16       the record, please.
17              SALLY CARTER:  Sally K. Carter.
18              TRUSTEE INGHRAM:  And Mr. Prillaman,
19       announce.
20              MR. PRILLAMAN:  Roger Prillaman with the
21       debtor.
22              TRUSTEE INGHRAM:  All right.  Any
23       creditors or interested parties of Miss Carter on
24       the line that wish to inquire?
```

3

1             MS. DELAMAR: Yes, this is Shannon

2    DeLaMar with the Illinois Attorney General's

3    Office on behalf of the Illinois Department of

4    Employment Security.

5             TRUSTEE INGHRAM:  And Ms. DeLaMar, we

6    did speak earlier.  I'm going to allot about 45

7    minutes to this.  So if you do have questions,

8    please feel free to ask.  In the meantime, I will

9    go ahead and present the questions I have.

10             So, Miss Carter --

11             MS. SHANNON DELAMAR:  Mr. Inghram, I

12    wanted to correct.  I said Department of

13    Employment Security.  I apologize. I represent the

14    Illinois Department of Human Services in this

15    case.

16             TRUSTEE INGHRAM:  Okay.

17             BRIDGET KAO:  I'm also on the line.

18    This is Bridget Kao.

19             TRUSTEE INGHRAM:  Okay.  All right.  So,

20    Miss Carter, you previously testified that you

21    forgot that you owned a vehicle, or that there was

22    a vehicle that had been given to your mother and

23    then was returned to you.  You testified that was

24    a 2019 VW Passat.  Is that right?

4

```
 1          SALLY CARTER:  That's what I said, but I
 2    was incorrect.
 3          TRUSTEE INGHRAM:  All right.  So in fact
 4    what vehicle do you own?
 5          SALLY CARTER:  Well, it's a 2020
 6    Volkswagen Jetta.
 7          TRUSTEE INGHRAM:  Okay.
 8          SALLY CARTER:  And I did not forget that
 9    I drove the vehicle.  The circumstances by which I
10    gave it to my mother by most people, you know, it
11    was confusing.  But the reality, after going
12    through the full process, speaking with my
13    attorney, ultimately the car is still in my
14    possession.
15          TRUSTEE INGHRAM:  It's your position, is
16    it not, that you own that car?
17          SALLY CARTER:  I do own it in the sense
18    that it was originally purchased for me.  It is
19    not, nor was it ever in my name or registered to
20    me.  So when it comes to the technical
21    terminology, I think that's when -- that's where
22    the confusion, I would say came from.
23          TRUSTEE INGHRAM:  So, it was purchased
24    for you originally.  It was a gift to you.  Is
```

5

1     that correct?

2             SALLY CARTER:  Correct.

3             TRUSTEE INGHRAM:  All right.  And then

4     you gave it to your mother for a period of time,

5     and she ended up giving it back to you.  Is that

6     correct?

7             SALLY CARTER:  That was the plan to

8     ultimately give it to my mother and it did not

9     work for her.  So, no.  She does not have the

10    vehicle.

11            TRUSTEE INGHRAM:  Did she ever have the

12    vehicle?  I'm a little confused now.

13            SALLY CARTER:  She did, yes, sir.  I'm

14    sorry, I'm trying to answer the questions very

15    clearly and honestly.  And it seems that that's

16    what causes the confusion.  I'm sorry.

17            TRUSTEE INGHRAM:  No, you're doing fine.

18    You're doing fine.  Keep it up.

19            So, the car is yours, but it's titled in

20    your husband's name, is that correct?

21            SALLY CARTER:  That is correct.

22            TRUSTEE INGHRAM:  All right.  Do you

23    know, is there a loan against the car?

24            SALLY CARTER:  There was, yes, sir.

6

1          TRUSTEE INGHRAM:  All right.  Are you

2     making payments on that loan?

3          SALLY CARTER:  No.

4          TRUSTEE INGHRAM:  Who's making the

5     payments?

6          SALLY CARTER:  It's in default.

7          TRUSTEE INGHRAM:  Okay.  Who has the

8     loan against the vehicle?

9          SALLY CARTER:  Volkswagen Credit.

10          TRUSTEE INGHRAM:  All right.  So, Mr.

11     Prillaman, you need to amend to show that car is

12     hers, and also the lien creditor as well.  I'd

13     like to have a copy of something showing the

14     amount of the debt.

15          MR. PRILLAMAN:  Mr. Inghram, I did send

16     you an e-mail just yesterday.  Her husband, James

17     Carter, did provide her with a page from his

18     credit report showing the loan balance in the

19     approximate sum of $28,000 to Volkswagen Credit.

20          TRUSTEE INGHRAM:  I did look at that.

21          MR. PRILLAMAN:  It's somewhat unusual.

22          TRUSTEE INGHRAM:  I did see that.

23          MR. PRILLAMAN:  Yeah.  It shows that the

24     loan was written off, and suggesting to me that in

7

1    all likelihood, if VW of America wrote it off,

2    then probably it was assigned to a collection

3    agency.  I personally have not seen Mr. Carter's

4    credit report.  I suggested to my client she might

5    inquire further to see if there's any possibility

6    that that credit report would show the transfer to

7    a collection agency.

8         But, it's somewhat unusual, and I have

9    advised her that since the vehicle is not in her

10   name, the automatic stay would not initially apply

11   to it so it could very well be that the vehicle

12   could be repossessed because of the credit report

13   shows there has not been contractual payments made

14   for quite sometime.

15        TRUSTEE INGHRAM:  Right.  Thank you for

16   that, Mr. Prillaman.  And then, ma'am, you're not

17   on that loan, is that correct?  It's your husband?

18   Miss Carter?

19        MR. PRILLAMAN:  That's correct.  That

20   report shows the responsibility is the husband's

21   name only.  So, Mr. Trustee Inghram, I'm happy to

22   amend, just for the record, what we would be

23   showing is she would have an equitable, rather

24   than a legal interest in this vehicle because it's

8

1    never been titled in her name.

2              TRUSTEE INGHRAM:  I think you're

3    probably aware, Mr. Prillaman, I know you're

4    aware, that title is just one indicia of

5    ownership.  So, yes, if you would amend and show

6    that.

7              SALLY CARTER:  Hello, hello?

8              TRUSTEE INGHRAM:  Are you still there,

9    Miss Carter?

10             SALLY CARTER:  Yes, somehow I got

11   disconnected.

12             TRUSTEE INGHRAM:  All right.  So, your

13   attorney and I were having a conversation about

14   the Jetta.  He's going to amend to schedule that

15   as your car.  He will probably indicate that it's

16   titled in your husband's name, but that it is your

17   car.  Ma'am, do you have any other vehicles

18   besides the Jetta?

19             SALLY CARTER:  No.

20             TRUSTEE INGHRAM:  Okay.  So, I was

21   looking at your expenses.  You do list, I think

22   it's $50.00 for the insurance.  Is that to cover

23   the Jetta?

24             SALLY CARTER:  Yes, sir.

9

```
 1              TRUSTEE INGHRAM:  All right.  And then I
 2      noticed also you are showing an expense of $562
 3      per month for life insurance at 15 A.  Is that
 4      correct?
 5              SALLY CARTER:  That is correct.
 6              TRUSTEE INGHRAM:  What size policy do
 7      you have?
 8              SALLY CARTER:  It's a life insurance
 9      policy.
10              TRUSTEE INGHRAM:  Is it a term policy or
11      is it a whole life policy?
12              SALLY CARTER:  It's a whole life policy
13      on my mother and on James.
14              TRUSTEE INGHRAM:  On your mother and on
15      James?  Mr. Prillaman, did you get me a copy of
16      that policy or at least the dec page?
17              MR. PRILLAMAN:  Right.  And just to
18      shortcut it, these are two policies, both are
19      whole life, as she said, on her mother and her
20      husband.  And those are listed on Schedule A/B.
21      Neither are -- well, these are newly acquired
22      policies, I think.  And there's very small cash
23      value.  And I sent you a printout of those to
24      verify that.
```

10

1          TRUSTEE INGHRAM:  I do see that.  All

2     right.

3          And let's see.  There was another

4     expense.  $450 per month for charitable

5     contributions and donations.  Is that correct?

6     Who are you paying $450 a month to?

7          SALLY CARTER:  That was over the period

8     of the two years.  And so yes, whenever I was

9     getting paid, I paid my tithe to churches and

10    nonprofit organizations.

11          TRUSTEE INGHRAM:  I may want you to

12    provide me proof of that.  Now, ma'am, back in

13    2021 your schedules, your statement of financial

14    affairs, show that you made some rather nice

15    income.  '21 it looks like $241,000.  Can you tell

16    me what happened to that money?  What you've done

17    with that money?  Do you have any of it?  Did you

18    keep any of it?  Did you have it in a cookie jar

19    or a wallet or a purse?

20          SALLY CARTER:  No, sir.  And I spoke to

21    my attorney about that because it looks very

22    misleading.  I had a day care at the time, youth

23    centers, and that was during COVID.  And so that

24    money was for the program.  My actual adjusted

11

1    gross income was only just over $16,000.

2              TRUSTEE INGHRAM:  Okay.  And ma'am, so

3    your testimony is that you have no supply of cash

4    anywhere?  You're not keeping any cash separate

5    and apart that you didn't include in your

6    bankruptcy?

7              SALLY CARTER:  No, sir.

8              TRUSTEE INGHRAM:  All right.  Ma'am, I

9    got sent a Facebook page.  And this Facebook page

10   is from you to friends captioned, "Money is

11   Calling You, Sally".  And it is a photo of a wad

12   of apparently 20 dollar bills.  And this Facebook

13   page was done on April 4th, the day after you

14   filed bankruptcy.  Can you explain that?

15             SALLY CARTER:  Oh, well, that's actually

16   a coincidence.  That is on Facebook, they have

17   these automatic like games, like predictors of

18   your future, your relationship, what's coming to

19   you, things like that.  I simply played that game.

20   And that was a prediction.  That wasn't like

21   something that I created or anything like that.

22             TRUSTEE INGHRAM:  So your testimony is

23   that you aren't holding, or that you didn't take a

24   picture of a satchel or purse filled with cash, is

12

1     that correct?

2              SALLY CARTER:  No, sir.  Yes, sir.  That

3     is correct.  I did not do that.

4              TRUSTEE INGHRAM:  You did not take a

5     picture of a lot of cash?

6              SALLY CARTER:  No, sir.

7              TRUSTEE INGHRAM:  I mean, what would you

8     --

9              SALLY CARTER:  No, sir.

10             TRUSTEE INGHRAM:  Well, then, ma'am, why

11    would this Facebook page appear to be a photograph

12    that apparently you took?

13             SALLY CARTER:  That's how the Facebook

14    systems are, sir.  It's an automatic, and it takes

15    your profile picture and inserts your profile

16    picture when you play the game.

17             TRUSTEE INGHRAM:  Oh, so that wad of

18    cash --

19             SALLY CARTER:  I didn't hold --

20             TRUSTEE INGHRAM:  Go ahead.

21             SALLY CARTER:  I didn't pose for that

22    picture.  I did not pose for that picture.  I did

23    not predict it.  That's what the algorithm would

24    come out for me.  I was excited because I'm broke.

13

1      So I was excited that that's in my future.  But

2      no, that wasn't a pose or anything.  No, nothing

3      like that.

4           TRUSTEE INGHRAM:  So your testimony is

5      you didn't take a photograph of a satchel or purse

6      filled with cash and place that on Facebook?  Is

7      that your testimony?

8           SALLY CARTER:  Correct.  Correct.  I did

9      not take a picture of myself with a satchel of

10     money and post it on Facebook.

11          TRUSTEE INGHRAM:  Ma'am, I didn't ask

12     whether you took a picture of yourself.  My

13     question to you is did you take a picture of a

14     satchel or purse filled with cash?  The first one

15     shown was a 20 dollar bill?

16          SALLY CARTER:  No, I did not.

17          TRUSTEE INGHRAM:  Okay.  And your

18     testimony is you don't have any cash around that

19     you kept around the house or kept stored away that

20     has not been mentioned or placed on your

21     bankruptcy paperwork, is that your testimony?

22          SALLY CARTER:  That is correct.

23          TRUSTEE INGHRAM:  Okay.  All right.

24     Now, ma'am, are you currently residing at the same

14

1    address that you scheduled in your bankruptcy in

2    Savoy, Illinois?  On Paddock Drive?

3            SALLY CARTER:  Yes, I am.  Yes.

4            TRUSTEE INGHRAM:  And do you have an

5    interest in that real estate?

6            SALLY CARTER:  No, I do not.

7            TRUSTEE INGHRAM:  All right.  I don't

8    recall, you may have testified that was your

9    mother's home?  Is that correct?

10           SALLY CARTER:  It's my mother's, yes.

11           TRUSTEE INGHRAM:  Yeah.  And that is

12    where you're currently residing, is that correct?

13           SALLY CARTER:  Correct.

14           TRUSTEE INGHRAM:  All right.  I believe

15    you also testified that you were estranged from

16    your husband.  Is that also correct?

17           SALLY CARTER:  Correct.

18           TRUSTEE INGHRAM:  You mentioned that on

19    Schedule A/B.

20           When -- and so you're living separate

21    and apart from your husband, and you're residing

22    with your mother.  When did you start living

23    separate and apart from your husband?

24           SALLY CARTER:  This time, in June.

15

```
 1              TRUSTEE INGHRAM:  In June of 2022?

 2              SALLY CARTER:  I'm sorry, 2022.

 3              TRUSTEE INGHRAM:  Yeah.  Okay.  And

 4    ma'am, I have Facebook pages of you apparently

 5    with your husband, and let's see; some of those

 6    were taken in June of 2022.  Okay.  Is your

 7    husband continuing to provide you with support,

 8    any form of support?

 9              SALLY CARTER:  Yes.  He would give, and

10    it's not consistent.  But, yes, when he gets paid

11    sometimes he will give me money through Cash App.

12              TRUSTEE INGHRAM:  And how much money

13    does he give you?

14              SALLY CARTER:  Well, it's not a steady,

15    it's not a consistent.  It's not like that.  If I

16    need something, if I go to him.

17              TRUSTEE INGHRAM:  He provides you with

18    any cash that you may need?

19              SALLY CARTER:  If I ask, yes.

20              TRUSTEE INGHRAM:  All right.  Did you

21    transfer any of the funds that you made through

22    any of your not-for-profit corporations to your

23    husband or any of his accounts in the last 12

24    months prior to filing your bankruptcy?
```

16

1          SALLY CARTER:  Last -- well, in the last

2     12 months?

3          TRUSTEE INGHRAM:  Prior to filing your

4     bankruptcy.  So you filed your bankruptcy on April

5     3rd of this year.  So going back 12 months, did

6     you transfer any money to him?  Let's make it a

7     little easier.

8          Did you transfer any money exceeding two

9     thousand dollars to your husband?  Either in a

10    lump sum or installments?

11         SALLY CARTER:  Within the last 12 months

12    I would have to confirm.  And I say that because

13    as he loans me money, I give it back.  So I would

14    have to confirm the dates.

15         TRUSTEE INGHRAM:  So you're saying you

16    don't know at this point?

17         SALLY CARTER:  Correct.  Within the 12

18    months.

19         TRUSTEE INGHRAM:  All right.  How about

20    in the last couple of years?  Last two years?

21    Have you transferred any sums of money exceeding

22    two thousand dollars to your husband or to any of

23    his accounts?

24         SALLY CARTER:  Yes.

17

1            TRUSTEE INGHRAM:  All right.  How much

2    do you think you would have transferred?

3            SALLY CARTER:  Well, I'm not going to

4    say transfer.  I would write him a check back.

5    Any money that he loaned, I would write the check

6    back to give to him, not transfer.

7            TRUSTEE INGHRAM:  So, in other words,

8    it's your testimony that you would have paid him

9    back?

10            SALLY CARTER:  Correct.  Not transfer.

11    When you say transfer, that's incorrect.  So I

12    would never have transferred money to him because

13    I don't have accounts.

14            TRUSTEE INGHRAM:  The bottom line is you

15    gave him some money, whether it was to repay him

16    or whether it was a gift to him, is that correct?

17            SALLY CARTER:  No, not a gift.  That's

18    not correct.  No, sir.

19            TRUSTEE INGHRAM:  That's what I'm

20    asking.  Regardless of what the basis, you know,

21    regardless of whether it was a repayment of a

22    loan, or whether it was a gift, you -- some money

23    went to him, either as a repayment of loan.  Well,

24    let's just say as a repayment of loan, is that

18

1    correct?

2              SALLY CARTER:  That's correct.

3              TRUSTEE INGHRAM:  All right.  Would

4    that, the amount of money that you repaid him,

5    exceed ten thousand dollars?

6              SALLY CARTER:  I would need to check,

7    sir.

8              TRUSTEE INGHRAM:  All right.  I need you

9    to check.

10             SALLY CARTER:  Yes, sir.

11             TRUSTEE INGHRAM:  I want you to check.

12   I want you to check your accounts for the last

13   couple of years, and provide me an affidavit as to

14   what the situation was.  If you repay, or if you

15   paid him or repaid him, I want to know how much,

16   and when it was repaid, okay?

17             SALLY CARTER:  Okay.  Yes, sir.

18             TRUSTEE INGHRAM:  All right.  I don't

19   have any questions, any further questions at this

20   point.  Ms. DeLaMar, did you have some questions

21   you wanted to ask?

22             MS. SHANNON DELAMAR:  Yes.  I do.  Miss

23   Carter, you, on your bankruptcy petition, does the

24   trustee cover report your address as 417 West

19

1     Paddock in Savoy?

2               SALLY CARTER:  Yes.

3               MS. SHANNON DELAMAR:  Who has lived at

4     that residence since 2020?

5               SALLY CARTER:  2020?

6               MS. SHANNON DELAMAR:  Um-huh.

7               SALLY CARTER:  My mother has been there

8     way longer than that.  I've been there on and off

9     throughout the years.  I mean, several people have

10    lived there.

11              MS. SHANNON DELAMAR:  Okay.  With your

12    mother?

13              SALLY CARTER:  Yes.

14              MS. SHANNON DELAMAR:  And with you when

15    you were living with your mother?

16              SALLY CARTER:  At some points, yes.

17              MS. SHANNON DELAMAR:  Since 2020?

18              SALLY CARTER:  Within the period of 2020

19    -- yes.

20              MS. SHANNON DELAMAR:  Okay.  So let's

21    start in 2020.  Who lived at 417 West Paddock?

22              SALLY CARTER:  I don't -- I don't know

23    who, back that far, who all live with my mom.  My

24    mom has always resided there.

20

1          MS. SHANNON DELAMAR:  Okay.  Were you

2    living with your mom in 2020?

3          SALLY CARTER:  2020?  Um, the Pandemic

4    hit in February 2020.  I was in Homer (sic) most

5    parts of 2020.  At this point I'm going to say no,

6    to think back.

7          MS. SHANNON DELAMAR:  Okay.  How about

8    in 2021?  Did you live with your mother at 417

9    Paddock in Savoy?

10         SALLY CARTER:  Yes, I did, in 2021.  I

11   can't think of the month.  But yes, there were

12   periods in 2021, yes.

13         MS. SHANNON DELAMAR:  And did someone

14   besides you and your mother live there in 2021?

15         SALLY CARTER:  My son.  My son, I think

16   that was -- the exact dates is what's stumping me.

17   But at one point, yes, I want to say it was 2021

18   my son also was there.  My daughter has also been

19   there at points as well.

20         MS. SHANNON DELAMAR:  Okay.  Which

21   daughter?  What's your daughter's name?

22         SALLY CARTER:  Jazzlyn has been there,

23   as well as Jalise and my son James; all three of

24   them have been there, as well as myself.

21

1               MS. SHANNON DELAMAR:  Okay.  And at the

2        first meeting of creditors on May 11th you

3        testified that in November of 2022 you moved out

4        and moved in with your husband, James Carter?

5               SALLY CARTER:  No.  So, on the last

6        call, it got heated.  I was asked about November,

7        because in November is when -- let me recall.

8        Yes, there was a period of time in November when I

9        stayed some nights with my husband at his

10       apartment.  That's correct.  And, yes.

11              MS. SHANNON DELAMAR:  Were there -- did

12       you spend the night?  I mean, did you live there

13       at all in December of 2022?

14              SALLY CARTER:  I lived in Savoy.  I have

15       stayed different places throughout the week,

16       throughout the year.  But I reside in Savoy.

17              MS. SHANNON DELAMAR:  Did you live with

18       your husband in December of 2022?

19              SALLY CARTER:  Did I live with my

20       husband?  No.

21              MS. SHANNON DELAMAR:  Did you stay

22       overnight and stay during the day at the place

23       where your husband lives in December of 2022?

24              SALLY CARTER:  Some days, I'm sure, yes.

22

1              MS. SHANNON DELAMAR:  How many days?

2              SALLY CARTER:  Oh, I don't know that.

3              MS. SHANNON DELAMAR:  Okay, how about

4      January of 2023?  Did you stay with your husband

5      where he lived?

6              SALLY CARTER:  I actually go over to his

7      place, my son lives there now, and we are friends.

8      We're not enemies.  So I actually go over to his

9      place often; between there and my mother's, until

10     I can get my own place.

11             TRUSTEE INGHRAM:  Ms. DeLaMar, I'm

12     sorry, let me interrupt just a second.  There's

13     some kind of a feedback, kind of what they call a

14     white sound.  I don't know who's causing that.

15     Everyone should have their phones on mute except

16     Ms. DeLaMar and Miss Carter.  If there are any

17     debtors or their attorney on the line, I want you

18     to put your phones on mute.  Okay.  That's better.

19     That's better.  Go ahead, Ms. DeLaMar.

20             MS. SHANNON DELAMAR:  Okay.  Thank you.

21     So, through January -- from January, 2023, through

22     today, you spend some days and some nights with

23     your husband, is that correct?

24             SALLY CARTER:  At his apartment.  The

23

1       way it's designed, I can do that, yes.

2               MS. SHANNON DELAMAR:  Okay.  Just an

3       estimate, how many days a week or how many weeks a

4       month?

5               SALLY CARTER:  Um, I don't know.  I

6       wouldn't say weeks a month.  More days.  I'd say

7       maybe two or three nights.

8               MS. SHANNON DELAMAR:  A week?

9               SALLY CARTER:  On average, yes.  If I'm

10      in town, yes.

11              MS. SHANNON DELAMAR:  Okay.  And I

12      believe at the last hearing you testified that you

13      started this in November of 2022, staying with

14      your husband.  Did you --

15              SALLY CARTER:  More often, yes.

16              MS. SHANNON DELAMAR:  Did you stay with

17      your husband at all from June of 2022 through

18      October of 2022?

19              SALLY CARTER:  I'm sure, I mean -- I'm

20      sure -- I would say yes.

21              MS. SHANNON DELAMAR:  Okay.  An average

22      of two to three nights a week?

23              SALLY CARTER:  During that period, no, I

24      wouldn't say that.  It was too tumultus, so no.

24

1            MS. SHANNON DELAMAR:  So from June to

2    October, how many times a week would you stay with

3    your husband?

4            SALLY CARTER:  Um, it wasn't weekly, so

5    that's difficult.  So I would just say if you're

6    going to say average, say once a week.

7            MS. SHANNON DELAMAR:  Okay.  And then

8    moving on to property listed.  You listed 401

9    Dodson Drive?

10            SALLY CARTER:  Yes.

11            MS. SHANNON DELAMAR:  In Champaign?

12            SALLY CARTER:  In Urbana.

13            MS. SHANNON DELAMAR:  Excuse me.  In

14    Urbana.  What is your interest in that property?

15            SALLY CARTER:  We bought it years ago.

16    Well, he bought it and he put my name at the end

17    on the deed.

18            MS. SHANNON DELAMAR:  When did he do

19    that?

20            SALLY CARTER:  When he bought it, oooh;

21    did he buy it 2000 -- was it '14?  No, don't quote

22    me.  That's not correct.

23            MR. PRILLAMAN:  Let me interject.  This

24    is Trustee Prillaman. Excuse me.

25

1              SALLY CARTER:  2010.

2              MR. PRILLAMAN:  2010 it was purchased

3      for $140,000.

4              SALLY CARTER:  I found it.  Thank you.

5              MS. SHANNON DELAMAR:  In 2010.  Okay.

6              MR. PRILLAMAN:  Shannon, she has a half

7      interest in that property, as we've clarified.

8      There was a typo on the original Schedule A/B.  We

9      corrected that she owns a 50 percent interest with

10     her husband.

11             MS. SHANNON DELAMAR:  Okay.  Thank you.

12     So, did you ever reside at 401 Dodson Drive?

13             SALLY CARTER:  Oh, yes; back then.

14             MS. SHANNON DELAMAR:  Back then, like

15     what years?

16             SALLY CARTER:  When he first bought the

17     house, when we were together.  Yes, in 2010.

18             MS. SHANNON DELAMAR:  Okay.  So, when

19     was the last time you lived at 401 Dodson?

20             SALLY CARTER:  2012?  Yes.

21             MS. SHANNON DELAMAR:  Okay.  Why did you

22     stop living there in 2012?

23             SALLY CARTER:  Because we bought a house

24     in Savoy.

26

```
1                    MS. SHANNON DELAMAR:  Okay.  Then what

2          did you do with the 401 Dodson Drive?  I mean, how

3          was it used after you moved out of it?

4                    SALLY CARTER:  He kept it as just a

5          rental property.

6                    MS. SHANNON DELAMAR:  Okay.  Who gets

7          the rent checks?

8                    SALLY CARTER:  He does.  I don't have

9          anything to do with the property.

10                   MS. SHANNON DELAMAR:  Okay.  So, do you

11         manage any financial transactions for that home?

12                   SALLY CARTER:  Not at all.

13                   MS. SHANNON DELAMAR:  Okay.  And do you

14         know who the tenants are on this rental property?

15                   SALLY CARTER:  I don't.  I don't deal

16         with that property at all.

17                   MS. SHANNON DELAMAR:  Okay.  And are the

18         tenants family members of yours?

19                   SALLY CARTER:  No.

20                   MS. SHANNON DELAMAR:  Okay.  And have

21         they ever been family members of yours since 2012

22         to your knowledge?

23                   SALLY CARTER:  No.  No.

24                   MS. SHANNON DELAMAR:  Okay.  Now we're
```

1      moving to payments to or for the benefit of any

2      family member or insider in the last two years

3      prior to bankruptcy.

4              SALLY CARTER:  I'm sorry?

5              MS. SHANNON DELAMAR:  I'm just telling

6      you, I'm moving to a different topic.

7              SALLY CARTER:  Oh, okay.

8              MS. SHANNON DELAMAR:  I'm moving on from

9      Dodson Drive, is what I'm trying to tell you.  In

10     the last two years you indicated that you made

11     some payments to your husband to repay amounts

12     paid to you.  But in the last two years, you

13     testified on May 11th that you did not make any

14     payments to or for the benefit of any family

15     member or insider.  So, you didn't pay anything --

16             SALLY CARTER:  That wasn't payment for

17     me.

18             MS. SHANNON DELAMAR:  I mean, did you

19     pay anything for your mother?

20             SALLY CARTER:  Okay.  You're asking, I'm

21     sorry, you're asking about the payments made to

22     James?  That wasn't for me.  That was for the

23     business.  So, no, that's why I was asking earlier

24     when he was saying gifts from James.  I want it to

1   be very clear.  Those are repayments for the

2   business.  That wasn't me gifting, just gifting

3   money.

4          MS. SHANNON DELAMAR:  Okay.  What

5   businesses?

6          SALLY CARTER:  It was for when I had the

7   Royal Academy, the day care.  And so during COVID

8   especially, trying to keep up, I couldn't keep up.

9   And so I borrowed -- and I borrowed money not just

10  from James.  I borrowed money from family to help

11  me keep up.

12         MS. SHANNON DELAMAR:  Okay.  I'll talk

13  about Royal Academy in a minute here.  Okay.  So,

14  besides your husband, did you pay any bills or any

15  payments for anyone else?  A family member, a

16  business insider, for the two years prior to

17  filing bankruptcy?

18         SALLY CARTER:  Like to pay back?  To pay

19  back loans or bills or anything?  Yes.

20         MS. SHANNON DELAMAR:   Who did you pay

21  besides your husband?

22         SALLY CARTER:  The Richardsons.  Johnny

23  and Mary Richardson.  I can get my attorney their

24  information.

1           MS. SHANNON DELAMAR:  And why did you

2     pay them?

3           SALLY CARTER:  I paid them back.  I got

4     a business loan from them and I paid them back.

5           MS. SHANNON DELAMAR:  Okay.  When did

6     you get a business loan, or do you not know right

7     now?

8           SALLY CARTER:  It was all during, this

9     is all during COVID.  This is all during between

10    2020  to like beginning of '22, so that period.

11          MS. SHANNON DELAMAR:  Okay.  But you're

12    going to get that information to your attorney,

13    who will get it to me or the trustee, right?

14          SALLY CARTER:  Yes.

15          MS. SHANNON DELAMAR:  Okay.  Did you pay

16    installments, or did you pay them in a lump sum?

17          SALLY CARTER:  I paid installments.

18          MS. SHANNON DELAMAR:  And how did you

19    pay them?

20          SALLY CARTER:  You mean, like wrote a

21    check or --

22          MS. SHANNON DELAMAR:  Yes.  Was it a

23    check or a Cash App?

24          SALLY CARTER:  It would be cash, or if

1    I'm not mistaken sometimes a cashier's check.  But

2    I'm going to have to confirm.

3              MS. SHANNON DELAMAR:  A cash and a check

4    drawn on what account?  What bank account?

5              SALLY CARTER:  Can I confirm, please?  I

6    don't want to give false information.  But it

7    would definitely -- I would have given a check or

8    cashier's check.  Never Cash App or anything like

9    that.

10             MS. SHANNON DELAMAR:  Okay.  So besides

11   the Richardsons, did you pay, make payments to or

12   for the benefit of any family member or insider in

13   the last two years?

14             SALLY CARTER:  To pay back money

15   borrowed?  Yes.  My sister.  So, I go through --

16             MS. SHANNON DELAMAR:  What's your

17   sister's name?

18             SALLY CARTER:  Cornica.

19             MS. SHANNON DELAMAR:  Cornica what?

20             SALLY CARTER:  Henderson.  I borrowed

21   money from both of my sisters and brother-in-law.

22   I borrowed money from family.  So I will get a

23   list to my attorney of what family members.

24             MS. SHANNON DELAMAR:  Okay.  Besides

31

1      repaying loans, did you make any payments to

2      anyone else?  Family members, insiders?

3                    SALLY CARTER:  No.

4                    MS. SHANNON DELAMAR:  And your children;

5      are they all adults?

6                    SALLY CARTER:  They are.

7                    MS. SHANNON DELAMAR:  Okay.  So they are

8      over 21 years of age?

9                    SALLY CARTER:  The youngest is 21.

10                   MS. SHANNON DELAMAR:  Is that your son?

11                   SALLY CARTER:  My daughter.

12                   MS. SHANNON DELAMAR:  Okay.  So, did you

13     pay any tuition for your kids in the last two

14     years?

15                   SALLY CARTER:  No.

16                   MS. SHANNON DELAMAR:  Any credit card

17     debt?

18                   SALLY CARTER:  Yes, but I have a card

19     with my daughter, and the amount that I was paying

20     on was not her debt, so I don't know how to answer

21     that.

22                   MS. SHANNON DELAMAR:  Okay.  Is the card

23     with your daughter listed on your bankruptcy

24     petition?

32

```
 1                    SALLY CARTER:  Yes.

 2                    MS. SHANNON DELAMAR:  Okay.  What card

 3           is that?

 4                    SALLY CARTER:  No.  No, I'm sorry.

 5           Please scratch that.  No.  Because I am an

 6           authorized user on her card.

 7                    MS. SHANNON DELAMAR:  Are you an

 8           authorized user on your other childrens' cards?

 9                    SALLY CARTER:  No.

10                    MS. SHANNON DELAMAR:  Just one child?

11           And which child is that?

12                    SALLY CARTER:  Jazzlyn.

13                    MS. SHANNON DELAMAR:  Okay.  Have you

14           made any car payments for any of your children?

15                    SALLY CARTER:  No.

16                    MS. SHANNON DELAMAR:  Any rent payments?

17                    SALLY CARTER:  I'm sorry?

18                    MS. SHANNON DELAMAR:  Rent payments?

19                    SALLY CARTER:  No.

20                    MS. SHANNON DELAMAR:  Rent?  Okay.

21           Child support?

22                    SALLY CARTER:  No.

23                    MS. SHANNON DELAMAR:  Traffic tickets?

24                    SALLY CARTER:  No.
```

1               MS. SHANNON DELAMAR:  Attorney's fees

2       for anyone other than your attorney, Roger

3       Prillaman, in this case?

4               SALLY CARTER:  Yes.  Okay.

5               MS. SHANNON DELAMAR:  Whose attorney's

6       fees did you pay?

7               SALLY CARTER:  My son.

8               MS. SHANNON DELAMAR:  And when did you

9       do that?

10              SALLY CARTER:  Through the course of

11      last year, 2022.

12              MS. SHANNON DELAMAR:  Okay.  And what

13      attorney did you pay?

14              SALLY CARTER:  Ruth Wyman.

15              MS. SHANNON DELAMAR:  And what was the

16      amount of that payment?  Or the total amount of

17      payment?

18              SALLY CARTER:  Six thousand.

19              TRUSTEE INGHRAM:  Let me interrupt just

20      a check.  Will you spell Bruce Lyman, please?

21              SALLY CARTER:  Ruth, R-U-T-H.  Wyman.

22      I'm going to confirm.

23              TRUSTEE INGHRAM:  And it's Wineman?

24              MR. PRILLAMAN:  Wyman, W-Y-M-A-N.

34

1                    SALLY CARTER:  Wyman.

2                    TRUSTEE INGHRAM:  Thank you.  And ma'am,

3        while there's a brief pause, spell Jazzlyn, your

4        daughter?

5                    SALLY CARTER:  J-A-Z-Z-L-Y-N.

6                    TRUSTEE INGHRAM:  And is her last name

7        Carter?  Is Jazzlyn's last name Carter?

8                    SALLY CARTER:  It's actually -- well,

9        she goes by Lynch.  It's Blue-Carter.

10       B-L-U-E-Carter.

11                   TRUSTEE INGHRAM:  And where does Jazzlyn

12       reside?  Is she an adult?

13                   SALLY CARTER:  She is an adult.  And she

14       lives -- we live with my mom in Savoy, 417 Paddock

15       Drive.

16                   TRUSTEE INGHRAM:  All right.  Thank you.

17                   MS. SHANNON DELAMAR:  Okay.  Is it my

18       turn again?

19                   TRUSTEE INGHRAM:  Yes, it is.  Sorry.

20                   MS. SHANNON DELAMAR:  Thanks.  Okay.

21       Miss Carter, so you paid six thousand dollars to

22       Ruth Wyman, your son's attorney, in 2022.  Did you

23       pay attorney fees for your son in 2021?

24                   SALLY CARTER:  I believe I started

1    paying in 2022.  I don't believe so.

2              MS. SHANNON DELAMAR:  Okay.  And have

3    you paid any attorney's fees for your son in 2023?

4              SALLY CARTER:  Maybe two payments.  I

5    will confirm that.  He is able to take over his

6    own payments.  I will confirm.  I may have paid

7    one payment, maybe in January.  But I will

8    confirm.

9              MS. SHANNON DELAMAR:  Okay.  Did you

10   post bond for your son in any of his criminal

11   cases?

12             SALLY CARTER:  No.

13             MS. SHANNON DELAMAR:  Did you make any

14   of his court-ordered payments in his criminal

15   cases?

16             SALLY CARTER:  No.

17             MS. SHANNON DELAMAR:  Okay.  And it

18   looks like in Champaign County, 23-CM-207, against

19   James I. Carter III, Ruth Wyman entered her

20   appearance on May 17th of 2023.  And you're saying

21   you made a payment and you will get me that

22   information?

23             SALLY CARTER:  I missed all of what you

24   said.  You were reading the case number?

1            MS. SHANNON DELAMAR:  Yeah.  In the

2       2023-CM-207, criminal trespass to a building

3       against your son, James I. Carter III, Ruth Wyman

4       entered her appearance on May 17th of 2023 in that

5       case.

6            SALLY CARTER:  Um-huh.

7            MS. SHANNON DELAMAR:  And you're saying

8       you made one payment to her?

9            SALLY CARTER:  Oh, no, no, no.  I didn't

10      make a payment on this.  No.  His case has been

11      ongoing.  And so I have been paying on his -- for

12      his attorney's fees.  But at the beginning of this

13      year when he got home and got a job, he was able

14      to take over and pay his own payments.  So I'm

15      saying I'm going to confirm if and how many

16      payments I made at the beginning of this year;

17      January, February.

18            MS. SHANNON DELAMAR:  Oh; toward a

19      different criminal case?

20            SALLY CARTER:  I suppose.  I don't know

21      what you're referring to right now.  It's for May.

22      I have not made any payments, no.

23            MS. SHANNON DELAMAR:  Okay.  And on the

24      --- changing topics again, on the May 11th,

1     creditor's hearing, you testified that your

2     husband, James Carter, bought a vehicle, I believe

3     you said it was a 2020 Volkswagen Passat, and he

4     bought that for you?  Is that right?

5               SALLY CARTER:  That is correct.

6               MS. SHANNON DELAMAR:  Okay.  And so you

7     drove it initially?

8               SALLY CARTER:  I did.

9               MS. SHANNON DELAMAR:  Okay.  For what

10    amount of time?

11              SALLY CARTER:  Um, really, okay, so that

12    was -- I think I got that in '19.  I apologize, I

13    have to think back dates.  So, I mean, I drove it

14    consistently until, again, around COVID.  We

15    weren't driving as much, and that's when my mom

16    needed a car.  In '20 -- more towards the end of

17    2021, beginning of 2022.

18              MS. SHANNON DELAMAR:  Okay.  And you

19    testified that your mother drove it.  How long did

20    she drive it for?

21              SALLY CARTER:  She didn't drive it long

22    at all because she didn't like it, unfortunately.

23    She drove it for a couple months, and then it

24    didn't -- for health reasons, it didn't work for

38

1     her.

2              MS. SHANNON DELAMAR:  Then I believe you

3     testified on May 11th, you said "we" bought her a

4     van.

5              SALLY CARTER:  The goal was -- yes.

6              MS. SHANNON DELAMAR:  Okay.  So what van

7     did you buy her?

8              SALLY CARTER:  And not buy.  My mother

9     had money saved up already to go towards the

10    vehicle.  I found someone, a private owner, and my

11    sister and I were helping to find her a vehicle

12    and get her a vehicle.  So that's what I mean by

13    "we"; the sisters.  I found someone local and we

14    were able to use the money that my mother already

15    had saved up to purchase her vehicle.  The van.

16             MS. SHANNON DELAMAR:  How much money was

17    that?

18             SALLY CARTER:  Twelve hundred dollars.

19    Then she made arrangements to pay the remaining

20    thousand with payments over the course of a few

21    months.  And she did.

22             MS. SHANNON DELAMAR:  Okay.  What kind

23    of vehicle did you find for her and she bought?

24             SALLY CARTER:  She bought -- it's just a

1      minivan.  Like a Dodge Caravan, if I'm not

2      mistaken.  Just an older minivan.

3              MS. SHANNON DELAMAR:  Is she driving

4      that vehicle to this day?

5              TRUSTEE INGHRAM:  Ms. DeLaMar, hold on

6      just a second, please.

7              SABRINA PETESCH:  Mr. Inghram --

8              TRUSTEE INGHRAM:  It sounds like Ms.

9      Petesch?

10             SABRINA PETESCH: Yes, Jim, sorry to

11     interrupt, but I'm just confirming.  It sounds

12     like the Sally Carter case, which was the first

13     341 meeting today, I think it's the 9:30 call.

14             TRUSTEE INGHRAM:  That's correct.

15             SABRINA PETESCH: And wondering if you

16     had switched orders with the Delaroso case or not.

17     But if not, I'm wondering, I don't know who's

18     questioning the debtor at the present time, but

19     whether she's going to wrap this up shortly,

20     because it sounds more like a deposition than a

21     meeting of creditors.

22             TRUSTEE INGHRAM:  Yeah, thank you, Ms.

23     Petesch.  I advised that I was going to allow 45

24     minutes for this.  We did do Delaroso already and

1    that's been dealt with.  Were you wanting to enter

2    your appearance in the Delaroso case?

3         SABRINA PETESCH:  No.  That's okay.  I

4    just wanted really to confirm that you did switch

5    the order and Delaroso was already off the docket.

6         TRUSTEE INGHRAM:  We did do that.

7         SABRINA PETESCH: Okay.  Fine.  I thought

8    you might be behind.  Perfect.  I'm waiting for

9    the ten o'clock call case.  No problem.

10        TRUSTEE INGHRAM:  Thank you.  You bet.

11        MR. PRILLAMAN:  Mr. Trustee, Shannon,

12   this is Roger Prillaman again.  Just to clarify,

13   'cuz the Volkswagen Jetta is a 2019, which is what

14   we sent you to clarify that.  And Shannon, she did

15   indicate at her May 11th meeting she thought it

16   was a Passat.  Then I researched it.  As it turned

17   out, it's a 2019 Volkswagen Jetta vehicle.  Just

18   to clarify.

19        MS. SHANNON DELAMAR:  Okay.  Thank you.

20        TRUSTEE INGHRAM:  All right.  And Ms.

21   DeLaMar, let's do this.  There are a number of

22   things that Miss Carter needs to provide us.  I

23   want the last two year's bank statements from her,

24   and an affidavit as far as who got paid what, and

1    when they got paid, and why.

2            And what we're going to do is schedule a

3    separate meeting.  Mr. Prillaman, I will call you,

4    I'm not going to schedule it for a standard 341

5    meeting.  But we're going to do this separately.

6    Maybe in the afternoon, something that works for

7    your client, Mr. Prillaman, and also for Ms.

8    DeLaMar and all other parties.

9            And Miss Kao is on the line and I'm sure

10   she has some questions too.  Miss Kao, did you

11   have any questions?

12           BRIDGET KAO:  I do, but if you would

13   like me to wait until the next meeting.

14           TRUSTEE INGHRAM:  Let's do that, Miss

15   Kao.  Can you give me your telephone number,

16   please?

17           BRIDGET KAO:  Sure.  217-417-9451.

18           TRUSTEE INGHRAM:  9451?

19           BRIDGET KAO:  Correct.

20           TRUSTEE INGHRAM:  All right.  Ms.

21   DeLaMar, I think I have yours.  I'm sorry to stop

22   the additional questions.  But I've got to get

23   moving.  We've got some cases waiting.  So, I will

24   be in touch with everyone.  Mr. Prillaman, I will

42

1   be in touch with you.  Ms. DeLaMar and Miss Kao,

2   any other interested parties on the line that wish

3   to inquire of Miss Carter?  All right.

4            I will be in touch with all of you.  We

5   will schedule a time that works for everyone.  We

6   will keep this a separate hearing.  That way we'll

7   have as much time as we need within reason.

8            So, I'm going to continue your meeting,

9   Miss Carter, and who's speaking now?

10            BRIDGET KAO:  Bridget.  I will be out of

11   town and unable to attend something from the 15th

12   through the 19th.

13            TRUSTEE INGHRAM:  All right.  Well, I'll

14   speak with you about that, all right?  We'll get

15   some dates that work for everyone.

16            BRIDGET KAO:  Okay.

17            TRUSTEE INGHRAM:  Miss Carter, we're

18   going to continue your case.  I will be in touch

19   with your attorney.  You may hang up now, and I

20   will be in touch with you, Ms. DeLaMar, as well.

21            (Proceedings adjourned.)

22

23

24

43

1     STATE OF ILLINOIS.)

2     COUNTY OF CHAMPAIGN)

3

4

5

6

7

8

9

10          I certify that I am not of counsel or

11    attorney for any of the parties hereto or in any

12    way interested in the event of this cause, and

13    that I am not related to any of the parties

14    hereto.  This is a taped transcription of

15    proceedings where the court reporter was not

16    present.

17

18

19

20                  Deann K. Parkinson

21                  Illinois License No.

22                  CSR 84-002089

23

24